1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ANDERSON CLARKSON JOHNSON BROWN PLLC**
2812 N Norwalk, Suite 106
Mesa, Arizona 85215
TELEPHONE: 480-373-9090
E-MAIL: nclarkson@abclawgroup.com

Nat Clarkson (SBN 021027)
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Meridian PO Finance LLC, an Arizona limited liability company,

Plaintiff,

v.

OTR Tire Group, Inc., a Delaware corporation; Chris Dellinges, an individual; Jason Adkins, an individual; Midwest Coal LLC, an Ohio limited liability company; LAD ImpEx Corporation, a Delaware corporation; XPO Global Forwarding, Inc. d/b/a XPO Global Logistics, Inc. and XPO Logistics, a Delaware corporation; Afif Baltagi, an individual; Roadmaster Trucking, a business entity of unknown origin; and John Does I-X;

Defendants.

Case No. 2:20-cv-00446-MTL

**FIRST AMENDED COMPLAINT**

Meridian PO Finance, LLC brings its first amended complaint against the following defendants: OTR Tire Group, Inc.; Chris Dellinges; Jason Adkins; Midwest Coal LLC; LAD ImpEx Corporation; XPO Global Forwarding, Inc. d/b/a XPO Global Logistics, Inc. and XPO Logistics; Afif Baltagi; and Roadmaster Trucking. The complaint is as follows:

INTRODUCTION

1. Meridian is one of several victims of the defendants' organized scheme to defraud companies and individuals out of millions of dollars through fraudulent transactions related to oversized off-the-road ("OTR") mining tires.

2.     The Defendants engaged in an elaborate confidence game, defined as "any swindle in which the swindler, after gaining the confidence of the victim, robs the victim by cheating at a gambling game, appropriating funds entrusted for investment, or the like."[1]

3.     Since the defendants' confidence game targeted sophisticated investors, such as Meridian, the game had to have an unusual level of depth and complexity.

4.     The mastermind behind the confidence game is unknown, but that is irrelevant to the reality that certain individuals and business entities all worked together in the fraudulent scheme by playing a particular role that was essential to the fraud's success.

5.     As set forth in this complaint, the named defendants each played a vital role in the overall fraudulent scheme and are jointly and severally liable for the loss this fraud caused to Meridian, which, as of June 15, 2021, is $21,407,584.

6.     Judgment against the defendants is necessary to restore Meridian to its previous position, to punish the defendants, and to prevent future victims of the defendants' continuing organized scheme.

JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Meridian and all of the defendants and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

8.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 as Meridian has pled claims pursuant to 18 U.S.C. § 1964(c) that are also related to the state law claims in this action in that they form part of the same case or controversy under Article III of the United States Constitution.

9.     Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Meridian's claims occurred in this district or pursuant to 28 U.S.C. § 1391(b)(3) as there is no district in which an action

---

[1] *See* www.dictionary.com/browse/confidence-game.

may otherwise be brought and every defendant is subject to the personal jurisdiction of this Court.

PARTIES

10.　　Plaintiff Meridian PO Finance, LLC ("Meridian") is an Arizona limited liability company doing business in Maricopa County, Arizona.

11.　　Defendant OTR Tire Group Inc. ("OTR Tire Group") is a Delaware corporation with its principal place of business at 4901 LBJ Freeway, Suite 200, Dallas, Texas 75244.

12.　　Defendant Chris Dellinges ("Dellinges") is an individual residing at 1230 Clipston Drive, Prosper, Texas 75078.

13.　　Defendant Midwest Coal, LLC ("Midwest") is an Ohio limited liability company with its principal place of business at 885 Sternberger Road, Jackson, Ohio 45640.

14.　　Defendant Jason Adkins ("Adkins") is an individual residing at 885 Sternberger Road, Jackson, Ohio 45640.

15.　　Defendant XPO Global Forwarding, Inc. d/b/a XPO Global Logistics, Inc. and XPO Logistics ("XPO") is a Delaware corporation with its principal place of business in Illinois.

16.　　XPO leases a storage facility located at 4513 Oates Road, Houston, Texas 77013 (the "Houston Facility").

17.　　Defendant Afif Baltagi is an individual residing at 2308 Nantucket Drive, Apt. C Houston, Texas 77057.

18.　　Baltagi was XPO's employee and the branch manager of the Houston Facility at all relevant times herein.

19.　　Defendant Roadmaster Trucking ("Roadmaster") is an entity whose principal place of business is in Texas at the Houston Facility.

20.　　Roadmaster owned the Houston Facility at all relevant times herein.

21.　　Defendant LAD ImpEx Corporation ("LAD") is a Delaware corporation with its principal place of business at 1 Bridge Plaza North, Suite 275, Fort Lee, New Jersey 07024.

22.    All of the defendants played a particular role in a collective scheme that was intended to defraud investors and lenders, like Meridian.

23.    As every defendant acted in furtherance of this collective scheme, Meridian hereby alleges that each defendant acted on his/its own behalf and as an agent of all the other defendants named in this suit.

24.    From time to time, Meridian may use the collective term "Defendants."  Such term shall be defined both as a description of the parties as defendants in this lawsuit but also as a direct reference to the Defendants acting as a collective group to advance the fraud and other acts alleged herein.

## OTR TIRE GROUP TRANSACTION

25.    OTR Tire Group is an alter ego of Defendants and was created and utilized for the sole purpose of perpetuating a fraud on Meridian and others.

26.    As OTR Tire Group is Defendants' alter ego, any allegation against OTR Tire Group shall be interpreted as also being made against Defendants and vice versa.

27.    In July 2014, Dellinges approached Meridian regarding an investment opportunity buying and selling OTR tires.

28.    In the proposed investment opportunity, Dellinges represented to Meridian that OTR Tire Group sought short-term financing to purchase OTR tires to sell to customers with whom OTR Tire Group already had existing relationships.

29.    In OTR Tire Groups' finance application, submitted on or around July 21, 2014, Dellinges stated that OTR Tire Group's largest customers were "Production Tire Co." and "Giant Tyres."

30.    Dellinges listed "XPO Global Logistics" as its "Agent/Forwarder" and listed Baltagi as the contact at XPO.

31.    Meridian reviewed the application and, after obtaining additional information from and about Dellinges and OTR Tire Group, approved the application.

32.    John Eckerd ("Eckerd") is an associate of Dellinges and Adkins who played a key role in perpetuating the fraud.

33.     Dellinges introduced Meridian to Adkins and Eckerd as two of Dellinges' associates who ostensibly assisted Dellinges in the tire transactions.

34.     Near the beginning of September 2014, OTR Tire Group came to Meridian with what was alleged to be a "sure thing"—the sale of 24 tires to its purported customer, Production Tire.

35.     According to Dellinges, the Rio Tinto mine located in Boron, CA was liquidating some of its tire stock through a broker, CB Mining Supply PTE, Ltd. ("CB Mining").

36.     Dellinges informed Meridian that OTR Tire Group wished to purchase 24 Michelin tires with the size/pattern of 4000R57/XDR2B (the "OTR Tire Group Michelin 40 Tires") from the Rio Tinto mine.

37.     Dellinges informed Meridian that, once the tires were purchased from the mine, that they would be shipped to the Houston Facility into XPO's care.

38.     Meridian researched whether XPO was a reputable company who could be trusted to store and handle the OTR Tire Group Michelin 40 Tires at the Houston Facility.

39.     XPO is a publicly traded company with a reputation for being a reliable provider of services regarding bulk freight and storage.

40.     XPO's website in 2014 stated the following: "XPO Logistics, Inc. (NYSE: XPO) is one of the fastest growing providers of transportation logistics services in North America. We're the fourth largest freight brokerage firm, the third largest provider of intermodal services, the largest provider of last-mile logistics for heavy goods and the largest manager of expedited shipments, with growing positions in managed transportation, global freight forwarding and less-than-truckload brokerage."

41.     XPO is a company that provides reliable service in its industry.

42.     Meridian agreed to provide financing for the OTR Tire Group Michelin 40 Tires because Meridian trusted that XPO was, in fact, a reliable party that would secure and protect Meridian's collateral and security interest.

43.     Because Meridian did not have a prior working relationship with OTR Tire Group, Meridian required a first position secured interest in the OTR Tire Group Michelin 40

Tires as well as a first position secured interest in the OTR tire inventory held by OTR Tire Group at the Houston Facility which consisted of another 24 Michelin tires with the size/pattern 4000R57/XDR2B (the "Additional OTR Tire Group Tires") (the OTR Tire Group Michelin 40 Tires and the Additional OTR Tire Group Tires shall be referred to collectively as the "OTR Tire Group Tires).

44.     Dellinges and Adkins represented to Meridian that OTR Tire Group owned the Additional OTR Tire Group Tires free and clear of any liens or encumbrances.

45.     Upon information and belief, Defendants, and others participating in Defendants' fraud, had, since 2014, already pledged some or all of the Additional OTR Tire Group Tires as collateral in other fraudulent investment schemes.

46.     In anticipation of the proposed transaction, on August 26, 2014, Meridian flew its representatives to Houston to inspect the Houston Facility and inspect the Additional OTR Tire Group Tires.

47.     While at the Houston Facility, Meridian met with Baltagi and Adkins and discussed XPO's involvement in managing, securing, and protecting the tires.

48.     While at the Houston Facility, Baltagi gave Meridian a tour of the facilities, and described in detail the processes that were, and would be, in place to keep Meridian's collateral safe.

49.     Baltagi assured Meridian that the OTR Tire Group Michelin 40 Tires would be secure while at the Houston Facility and that they would not come or go without Meridian's knowledge and permission.

50.     Baltagi assured Meridian that the Additional OTR Tire Group Tires would be secure at the Houston Facility and that they would not come or go without Meridian's knowledge and permission.

51.     Baltagi assured Meridian that any other OTR tires that were Meridian's collateral would be secure at the Houston Facility and that they would not come or go without Meridian's knowledge and permission.

52.     The price to purchase the OTR Tire Group Michelin 40 Tires from the Rio Tinto mine was $1,636,800.00.

53.     On or about September 5, 2014, Meridian entered into a finance agreement with OTR Tire Group (the "OTR Finance Agreement"). A true and correct copy of the OTR Finance Agreement is attached hereto as Exhibit A.[2]

54.     In order to obtain additional security for the transaction, Meridian required that Dellinges, Adkins, and Eckerd sign personal guaranties with respect to OTR Tire Group's obligations.

55.     Dellinges, Adkins, and Eckerd did, in fact, execute those guaranties. True and correct copies of the Dellinges Guaranty and the Adkins Guaranty are attached hereto as Exhibits B and C.

56.     Meridian performed a search of recorded Uniform Commercial Code ("UCC") financing statements and the search revealed that there were no liens or encumbrances on the Additional OTR Tire Group Tires that listed OTR Tire Group as the debtor.

57.     If Defendants had pledged the Additional OTR Tire Group Tires as collateral, they did so in the name of other entities, so as to make it impossible for Meridian to know that they were encumbered.

58.     In anticipation of the proposed transaction, Meridian flew its representatives to the Rio Tinto mine to physically inspect the OTR Tire Group Michelin 40 Tires.

59.     The "identity" of OTR tires are verified by individual and distinct serial numbers that are located on the side the tires.

60.     If a tire's serial number is removed, damaged, or otherwise defaced, it is possible to know the manufacturer and size of a particular OTR tire, but it is impossible to verify any particular tire's identity.

61.     Meridian physically inspected the OTR Tire Group Michelin 40 Tires, including the serial numbers, and confirmed that they were, in fact, the tires which they intended on financing.

---

[2] Exhibit A does not include the exhibits referenced in that agreement.

62.     In anticipation of the proposed transaction, Meridian insisted that OTR Tire Group have a warehouse agreement with XPO that would require that XPO honor and protect the security interest that Meridian had in the OTR Tire Group Tires.

63.     On September 5, 2014, OTR Tire Group and XPO entered into such a warehouse agreement (the "Warehouse Agreement"). A true and correct copy of the Warehouse Agreement is attached hereto as Exhibit D.

64.     Dellinges signed the Warehouse Agreement on behalf of OTR Tire Group.

65.     Baltagi signed the Warehouse Agreement on XPO's behalf as the "Manager" of the Houston Facility.

66.     Pursuant to the Warehouse Agreement, XPO agreed that it did not have any written notification that any person or entity other than Meridian held a security interest in the OTR Tire Group.

67.     Pursuant to the Warehouse Agreement, XPO agreed that Meridian could have access to the Houston Facility to examine and/or remove Meridian's inventory

68.     Pursuant to the Warehouse Agreement, XPO agreed not to issue warehouse receipts to any other party with respect to Meridian's inventory.

69.     Pursuant to the Warehouse Agreement, XPO agreed that it had not already issued warehouse receipts with respect to Meridian's inventory.

70.     Pursuant to the Warehouse Agreement, XPO agreed that it would give Meridian an updated inventory upon Meridian's request for the same.

71.     On or about September 9, 2014, OTR Tire Group submitted a "Request for Advance" to finance the $1,636,800.00 necessary to purchase the OTR Tire Group Michelin 40 Tires. A true and correct copy of the Request for Advance is attached hereto as Exhibit E.

72.     In the Request for Advance, OTR Tire Group stated that OTR Tire Group had a "recurring contract" with Production Tire.

73.     Dellinges provided Meridian with a "Proforma Invoice" from CB Mining reflecting the arrangement for OTR Tire Group to purchase the OTR Tire Group Michelin 40 Tires. A true and correct copy of the Proforma Invoice is attached hereto as Exhibit F.

74.     Dellinges, Adkins, and Eckerd represented to Meridian that once the OTR Tire Group Michelin 40 Tires arrived at the Houston Facility from the Rio Tinto mine, that the sale to Production Tire would close soon thereafter.

75.     To support the alleged transaction, Dellinges provided Meridian with a purchase order ostensibly generated by Production Tire that obligated Production Tire to purchase the OTR Tire Group Michelin 40 Tires for $2,520,000.00 (the "Production Purchase Order"). A true and correct copy of the Production Purchase Order is attached hereto as Exhibit G.

76.     In actuality, the Production Purchase Order was fraudulent: Production Tire was merely another entity controlled by Defendants for the purpose of perpetuating their collective fraud.

77.     Meridian secured its interests in the OTR Tire Group Tires by filing a UCC financing statement listing "OTR Tire Group Corp." as the debtor.

78.     In order to safeguard its funds and ensure that payments were only made upon successful completion of a particular transaction, Meridian required that a freight forwarder handle the funds and verify shipment of the OTR tires in question.

79.     Defendants introduced Meridian to LAD, a bonded freight forwarder who had, ostensibly, handled numerous OTR tire transactions over the years for them.

80.     XPO, through Baltagi, also reassured Meridian that XPO had numerous successful transactions through LAD and that LAD and Ahmet Neidik ("Neidik"), LAD's ostensible owner, could be trusted.

81.     Based on those representations, Meridian agreed to use LAD as the freight forwarder for the transaction with OTR Tire Group.

82.     On September 11, 2014, Meridian fulfilled its obligation under the Finance Agreement and wired funds to LAD.

83.     Though LAD was ostensibly owned and managed by Neidik, unbeknownst to Meridian, LAD was actually another entity controlled by Defendants.

84.     The OTR Tire Group Michelin 40 Tires were transported from the Rio Tinto mine to the Houston Facility.

85.     After being informed that the OTR Tire Group Michelin 40 Tires had arrived in Houston, Meridian sent its representative to the Houston Facility to confirm that the OTR Tire Group Michelin 40 Tires had actually arrived.

86.     On October 4, 2014, Meridian physically confirmed that the OTR Tire Group Michelin 40 Tires had, in fact, been delivered and were secured by XPO at the Houston Facility.

87.     OTR tires are so heavy and bulky that it takes specialized heavy equipment to move them.

88.     XPO did not have its own heavy equipment at the Houston Facility.

89.     If XPO desired to unload, load, or move OTR tires in the Houston Facility, XPO would have Roadmaster Trucking perform those services.

90.     Roadmaster Trucking and XPO worked hand-in-hand with respect to the operations at the Houston Facility.

91.     Upon information and belief, XPO and Roadmaster shared an office at the Houston Facility and even shared software and records to manage the movement of the OTR tires entering and leaving the Houston Facility.

92.     XPO and Roadmaster Trucking had physical control of all of the OTR tires at the Houston Facility, including all the tires in which Meridian had an interest.

93.     After the delivery of the OTR Tire Group Michelin 40 Tires to the Houston Facility, Meridian was informed that the purported transaction with Production Tire fell through.

MIDWEST TRANSACTIONS

94.     Midwest is an alter ego of Defendants and was created and utilized for the sole purpose of perpetuating a fraud on Meridian and others.

95.     As Midwest is Defendants' alter ego, any allegation against Midwest shall be interpreted as also being made against Defendants and vice versa.

96.     In August 2014, Adkins approached Meridian about financing other OTR tire transactions Midwest, an entity owned by Adkins.

97.     The form of the transactions proposed by Adkins was identical to the transaction that was already in the process with OTR Tire Group: Midwest would find a seller and a buyer and Meridian would provide short-term financing for the transaction.

98.     In the proposed investment opportunity, Adkins represented to Meridian that Midwest sought financing to purchase OTR tires to sell to customers with whom Midwest already had existing relationships.

99.     Adkins represented that LAD would act as the freight forwarder and that XPO would ultimately secure the collateral.

100.    But for Meridian's ongoing relationship with XPO and the representations made by Baltagi and XPO, Meridian would not have entered into the agreement with Midwest.

101.    During Meridian's August site visit to the Houston Facility, Baltagi confirmed that XPO would follow the same protocol and procedure as it was following with the OTR Tire Group transaction to secure all of the collateral in which Meridian had an interest.

102.    During Meridian's site visit to the Houston Facility, and in additional conversations with Meridian following the site visit, Baltagi confirmed that XPO would commit to the same obligations with respect to Meridian's interaction with Midwest as with OTR Tire Group (the "Midwest Warehouse Agreement").

103.    On or about September 11, 2014, Meridian entered into a finance agreement with Midwest (the "Midwest Finance Agreement"). A true and correct copy of the Midwest Finance Agreement is attached hereto as Exhibit H.[3]

104.    In order to obtain additional security for the transaction, Meridian required that Adkins sign a personal guaranty with respect to Midwest's transactions.

---

[3] Exhibit A does not include the exhibits referenced in that agreement.

105.    Adkins, did, in fact, execute a guaranty (the "Adkins Midwest Guaranty"). True and correct copies of the Adkins Midwest Guaranty is attached hereto as Exhibit I.

106.    From September to November 2014, Adkins brought five separate Midwest transactions to Meridian for funding.

*Midwest Transaction #1*

107.    According to Adkins, Best One Tire of Hillsboro ("Best One") wanted to sell 36 Bridgestone OTR tires with the size/pattern of 2700R49/VREP (the "Midwest Transaction #1 Tires").

108.    Adkins informed Meridian that, once the Midwest Transaction #1 Tires were purchased from Best One, that they would be shipped to the Houston Facility into XPO's care.

109.    Meridian agreed to provide financing for the Midwest Transaction #1 Tires because Meridian trusted that XPO was, in fact, a reliable party that would secure and protect Meridian's collateral and security interest.

110.    The price to purchase the Midwest Transaction #1 Tires from Best One was $432,000.00.

111.    Meridian performed a search of recorded UCC financing statements and the search revealed that there were no liens or encumbrances on the Midwest Transaction #1 Tires that listed Midwest as the debtor.

112.    In anticipation of the proposed transaction, Meridian flew its representatives to Best One's place of business in Ohio to physically inspect the Midwest Transaction #1 Tires.

113.    Meridian physically inspected the and confirmed that they were, in fact, the tires which they intended on financing.

114.    On or about September 18, 2014, Midwest submitted a "Request for Advance" to finance the $432,000.00 necessary to purchase the Midwest Transaction #1 Tires. A true and correct copy of the Request for Advance is attached hereto as Exhibit J.

115.   In the Request for Advance, Midwest stated that it intended on purchasing the Midwest Transaction #1 Tires and selling them to RJM International, located in North Saanich, British Columbia ("RJM").

116.   In the Request for Advance, Midwest stated that it had a "recurring contract" with RJM.

117.   Adkins provided Meridian with a "Work Order" from Best One reflecting the arrangement for Midwest to purchase the Midwest Transaction #1 Tires. A true and correct copy of the Work Order is attached hereto as Exhibit K.

118.   Adkins represented to Meridian that once the Midwest Transaction #1 Tires arrived at the Houston Facility from Best One, that the transaction with RJM would close soon thereafter.

119.   To support the alleged transaction, Adkins provided Meridian with a purchase order ostensibly generated by RJM that obligated RJM to purchase the Midwest Transaction #1 Tires for $612,000.00 (the "RJM Purchase Order"). A true and correct copy of the RJM Purchase Order is attached hereto as Exhibit L.

120.   Meridian secured its interests in the Midwest Transaction #1 Tires by filing a UCC financing statement listing Midwest as the debtor.

121.   On September 19, 2014, Meridian fulfilled its obligation under the Midwest Finance Agreement and wired funds to LAD.

122.   The Midwest Transaction #1 Tires were transported from Best One to the Houston Facility.

123.   On or about October 20, 2014, Neidik confirmed that the Midwest Transaction #1 Tires had arrived at the Houston Facility.

124.   On or about October 20, 2014, Baltagi confirmed that the Midwest Transaction #1 Tires had arrived at the Houston Facility.

125.   After the delivery of the Midwest Transaction #1 Tires to the Houston Facility, Adkins informed Meridian that the transaction with RJM had been consummated and paid

Meridian the amounts due in connection with loan to purchase the Midwest Transaction #1 Tires.

*Midwest Transaction #2*

126.   According to Adkins, Best One wanted to sell 12 Bridgestone OTR tires with the size/pattern of 4000R57/VRDP (the "Midwest Transaction #2 Tires").

127.   Adkins informed Meridian that, once the Midwest Transaction #2 Tires were purchased from Best One, that they would be shipped to the Houston Facility into XPO's care.

128.   Meridian agreed to provide financing for the Midwest Transaction #2 Tires because Meridian trusted that XPO was, in fact, a reliable party that would secure and protect Meridian's collateral and security interest.

129.   The price to purchase the Midwest Transaction #2 Tires from Best One was $720,000.00.

130.   Meridian performed a search of recorded UCC financing statements and the search revealed that there were no liens or encumbrances on the Midwest Transaction #2 Tires that listed Midwest as the debtor.

131.   In anticipation of the proposed transaction, Meridian flew its representatives to Best One's place of business in Ohio to physically inspect the Midwest Transaction #2 Tires.

132.   Meridian physically inspected the Midwest Transaction #2 Tires and confirmed that they were, in fact, the tires which they intended on financing.

133.   On or about September 18, 2014, Midwest submitted a "Request for Advance" to finance the $720,000.00 necessary to purchase the Midwest Transaction #2 Tires. A true and correct copy of the Request for Advance is attached hereto as Exhibit M.

134.   In the Request for Advance, Midwest stated that it intended on purchasing the Midwest Transaction #2 Tires and selling them to Mac Enterprises, located in Georgetown, Guyana ("Mac Enterprises").

135.   In the Request for Advance, Midwest stated that it had a "recurring contract" with Mac Enterprises.

136.   Adkins provided Meridian with a "Work Order" from Best One reflecting the arrangement for Midwest to purchase the Midwest Transaction #2 Tires. A true and correct copy of the Work Order is attached hereto as Exhibit N.

137.   Adkins represented to Meridian that once the Midwest Transaction #2 Tires arrived at the Houston Facility from Best One, that the transaction with Mac Enterprises would close soon thereafter.

138.   To support the alleged transaction, Adkins provided Meridian with a purchase order ostensibly generated by Mac Enterprises that obligated Mac Enterprises to purchase the Midwest Transaction #2 Tires for $996,000.00 (the "Mac Enterprises Purchase Order"). A true and correct copy of the Mac Enterprises Purchase Order is attached hereto as Exhibit O.

139.   Meridian secured its interests in the Midwest Transaction #2 Tires by filing a UCC financing statement listing Midwest as the debtor.

140.   On September 23, 2014, Meridian fulfilled its obligation under the Midwest Finance Agreement and wired funds to LAD.

141.   The Midwest Transaction #2 Tires were transported from Best One to the Houston Facility.

142.   On or about October 23, 2014, Neidik confirmed that the Midwest Transaction #2 Tires had arrived at the Houston Facility.

143.   On or about October 23, 2014, Baltagi confirmed that the Midwest Transaction #2 Tires had arrived at the Houston Facility.

144.   After of the delivery of the Midwest Transaction #2 Tires to the Houston Facility, Adkins informed Meridian that the purported transaction with Mac Enterprises fell through.

*Midwest Transaction #3*

145.    According to Adkins, Best One wanted to sell 36 Bridgestone OTR tires with the size/pattern of 2700R49/VREP (the "Midwest Transaction #3 Tires").

146.    Adkins informed Meridian that, once the Midwest Transaction #3 Tires were purchased from Best One, that they would be shipped to the Houston Facility into XPO's care.

147.    Meridian agreed to provide financing for the Midwest Transaction #3 Tires because Meridian trusted that XPO was, in fact, a reliable party that would secure and protect Meridian's collateral and security interest.

148.    The price to purchase the Midwest Transaction #3 Tires from Best One was $432,000.00.

149.    Meridian performed a search of recorded UCC financing statements and the search revealed that there were no liens or encumbrances on the Midwest Transaction #3 Tires that listed Midwest as the debtor.

150.    In anticipation of the proposed transaction, Meridian flew its representatives to Best One's place of business in Ohio to physically inspect the Midwest Transaction #3 Tires.

151.    Meridian physically inspected the Midwest Transaction #3 Tires and confirmed that they were, in fact, the tires which they intended on financing.

152.    On or about September 29, 2014, Midwest submitted a "Request for Advance" to finance the $432,000.00 necessary to purchase the Midwest Transaction #3 Tires. A true and correct copy of the Request for Advance is attached hereto as Exhibit P.

153.    In the Request for Advance, Midwest stated that it intended on purchasing the Midwest Transaction #3 Tires and selling them to RJM.

154.    In the Request for Advance, Midwest stated that it had a "recurring contract" with RJM.

155.    Adkins provided Meridian with a "Work Order" from Best One reflecting the arrangement for Midwest to purchase the Midwest Transaction #3 Tires. A true and correct copy of the Work Order is attached hereto as Exhibit Q.

156.    Adkins represented to Meridian that once the Midwest Transaction #3 Tires arrived at the Houston Facility from Best One, that the transaction with RJM would close soon thereafter.

157.    To support the alleged transaction, Adkins provided Meridian with a purchase order ostensibly generated by RJM that obligated RJM to purchase the Midwest Transaction #3 Tires for $612,000.00 (the "RJM Purchase Order"). A true and correct copy of the RJM Purchase Order is attached hereto as Exhibit R.

158.    Meridian secured its interests in the Midwest Transaction #3 Tires by filing a UCC financing statement listing Midwest as the debtor.

159.    On October 2, 2014, Meridian fulfilled its obligation under the Midwest Finance Agreement and wired funds to LAD.

160.    The Midwest Transaction #3 Tires were transported from Best One to the Houston Facility.

161.    On or about November 3, 2014, Neidik confirmed that the Midwest Transaction #3 Tires had arrived at the Houston Facility.

162.    On or about November 3, 2014, Baltagi confirmed that the Midwest Transaction #3 Tires had arrived at the Houston Facility.

163.    After the delivery of the Midwest Transaction #3 Tires to the Houston Facility, Adkins informed Meridian that the purported transaction with RJM fell through.

*Midwest Transaction #4*

164.    According to Adkins, Henderson Sales & Equipment ("Henderson") wanted to sell 12 Bridgestone OTR tires with the size/pattern of 4000R57/VRDP (the "Midwest Transaction #4 Tires").

165.    Henderson was an approved vendor for Goodyear Tires who was known to ensure shipments of tires directly from the Goodyear factory to end users.

166.   From time to time, Henderson would work through third parties to facilitate the sale and shipment of surplus tires to the international OTR tire market.

167.   Midwest informed Meridian that, once the Midwest Transaction #4 Tires were purchased from Henderson, that they would be shipped to the Houston Facility into XPO's care.

168.   Meridian agreed to provide financing for the Midwest Transaction #4 Tires because Meridian trusted that XPO was, in fact, a reliable party that would secure and protect Meridian's collateral and security interest.

169.   The price to purchase the Midwest Transaction #4 Tires from Henderson was $678,000.00.

170.   Meridian performed a search of recorded UCC financing statements and the search revealed that there were no liens or encumbrances on the Midwest Transaction #4 Tires that listed Midwest as the debtor.

171.   On or about October 8, 2014, Midwest submitted a "Request for Advance" to finance the $678,000.00 necessary to purchase the Midwest Transaction #4 Tires. A true and correct copy of the Request for Advance is attached hereto as Exhibit S.

172.   In the Request for Advance, Midwest stated that it intended on purchasing the Midwest Transaction #4 Tires and selling them to Giant Tyres, located in North Victoria, Australia ("Giant").

173.   In the Request for Advance, Midwest stated that it had a "recurring contract" with Giant.

174.   Adkins provided Meridian with a "Invoice" from Henderson reflecting the arrangement for Midwest to purchase the Midwest Transaction #4 Tires. A true and correct copy of the Work Order is attached hereto as Exhibit T.

175.   Adkins represented to Meridian that once the Midwest Transaction #4 Tires arrived at the Houston Facility from Henderson, that the transaction with Giant would close soon thereafter.

176.    To support the alleged transaction, Adkins provided Meridian with a purchase order ostensibly generated by Giant that obligated Giant to purchase the Midwest Transaction #4 Tires for $984,000.00 (the "Giant Purchase Order"). A true and correct copy of the Giant Purchase Order is attached hereto as Exhibit U.

177.    Meridian secured its interests in the Midwest Transaction #4 Tires by filing a UCC financing statement listing Midwest as the debtor.

178.    On October 10, 2014, Meridian fulfilled its obligation under the Midwest Finance Agreement and wired funds to LAD.

179.    The Midwest Transaction #4 Tires were transported from Henderson to the Houston Facility.

180.    On or about November 10, 2014, Neidik confirmed that the Midwest Transaction #4 Tires had arrived at the Houston Facility.

181.    On or about November 10, 2014, Baltagi confirmed that the Midwest Transaction #4 Tires had arrived at the Houston Facility.

182.    After the delivery of the Midwest Transaction #4 Tires to the Houston Facility, Adkins informed Meridian that the purported transaction with Giant fell through.

*Midwest Transaction #5*

183.    According to Adkins, Western Track and Tires ("Western Track") wanted to sell 12 Goodyear OTR tires with the size/pattern of 3700R57/RM4A and 12 Goodyear OTR Tires with the size/pattern of 4690R57/RM4A (the "Midwest Transaction #5 Tires").

184.    Midwest informed Meridian that, once the Midwest Transaction #5 Tires were purchased from Western Track, that they would be shipped to the Houston Facility into XPO's care.

185.    Meridian agreed to provide financing for the because Meridian trusted that XPO was, in fact, a reliable party that would secure and protect Meridian's collateral and security interest.

186.    The price to purchase the Midwest Transaction #4 Tires from Western Track was $960,000.00.

187.     Meridian performed a search of recorded UCC financing statements and the search revealed that there were no liens or encumbrances on the Midwest Transaction #5 Tires that listed Midwest as the debtor.

188.     On or about November 3, 2014, Midwest submitted a "Request for Advance" to finance the $960,000.00 necessary to purchase the Midwest Transaction #5 Tires. A true and correct copy of the Request for Advance is attached hereto as Exhibit V.

189.     In the Request for Advance, Midwest stated that it intended on purchasing the Midwest Transaction #5 Tires and selling them to Giant, located in North Victoria, Australia.

190.     In the Request for Advance, Midwest stated that it had a "recurring contract" with Giant.

191.     Adkins provided Meridian with an "Invoice" from Western Track reflecting the arrangement for Midwest to purchase the Midwest Transaction #5 Tires (the "Western Track Invoice"). A true and correct copy of the Western Track Invoice is attached hereto as Exhibit W.

192.     Adkins represented to Meridian that once the Midwest Transaction #5 Tires arrived at the Houston Facility from Western Track, that the transaction with Giant would close soon thereafter.

193.     To support the alleged transaction, Adkins provided Meridian with a "Purchase Order" ostensibly generated by Giant that obligated Giant to purchase the Midwest Transaction #5 Tires for $1,662,000.00 (the "Giant Purchase Order"). A true and correct copy of the Giant Purchase Order is attached hereto as Exhibit X.

194.     Meridian secured its interests in the Midwest Transaction #5 Tires by filing a UCC financing statement listing Midwest as the debtor.

195.     On November 4, 2014, 2014, Meridian fulfilled its obligation under the Midwest Finance Agreement and wired funds to LAD.

196.     The Midwest Transaction #5 Tires were transported from Western Track to the Houston Facility.

197.    On or about December 4, 2014, Neidik confirmed that the Midwest Transaction #5 Tires had arrived at the Houston Facility.

198.    On or about December 4, 2014, Baltagi confirmed that the Midwest Transaction #5 Tires had arrived at the Houston Facility.

199.    After the delivery of the Midwest Transaction #5 Tires to the Houston Facility, Adkins informed Meridian that the purported transaction with Giant fell through.

200.    The Midwest Transaction #1 Tires, Midwest Transaction #2 Tires, the Midwest Transaction #3 Tires, the Midwest Transaction #4 Tires, and the Midwest Transaction #5 Tires shall be referred to collectively herein as the "Midwest Tires."

<u>THE AFTERMATH</u>

201.    By the middle of 2015, after taking into account the release of the Midwest Transaction #1 Tires for which Meridian had received payment, Meridian had a security interest in the following tires (with the amounts loaned in corresponding parentheses):

        a.   48 OTR Tire Group Tires ($1,636,800.00);

        b.   12 Midwest Transaction #2 Tires ($720,000.00);

        c.   36 Midwest Transaction #3 Tires ($432,000.00);

        d.   12 Midwest Transaction #4 Tires ($678,000.00); and

        e.   24 Midwest Transaction #5 Tires ($960,000.00).

202.    By the middle of 2015, Meridian had a secured interest in 132 OTR tires and had loaned the principal amount of $4,426,800 for the purchase of those tires.

203.    From the time that the tires were delivered to the Houston Facility, OTR Tire Group and Midwest made numerous representations regarding alleged purchasers who were interested in purchasing the OTR Tire Group Tires and the Midwest Tires.  These potential transactions fell through for a variety of reasons.

204.    During this time, Meridian had communication with XPO regarding the inventory of tires that were held for Meridian's benefit at the Houston Facility.

205.   On numerous occasions between 2015 and 2018, Adkins, Baltagi, and Neidik, on Defendants' behalf, confirmed that Meridian's inventory was on the ground at the Houston Facility.

206.   Over time, as OTR Tire Group and Midwest continued to default on their obligations under their respective finance agreements, Meridian demanded that OTR Tire Group and Midwest assign their interests in the OTR tires which secured Meridian's loans.

207.   On or around January 22, 2016, OTR Tire Group executed a "Consent to Take Possession of Collateral and Foreclose", assigning the title of the OTR Tire Group Tires to Meridian (the "OTR Consent"). A true and correct copy of the OTR Consent is attached hereto as Exhibit Y.

208.   The OTR Consent confirmed, by serial number, the tires that were subject to the OTR Consent.

209.   On or around January 12, 2017, Midwest executed a "Consent to Take Possession of Collateral and Foreclose", assigning the title of the Midwest Tires to Meridian (the "Midwest Consent"). A true and correct copy of the Midwest Consent is attached hereto as Exhibit Z.

210.   The Midwest Consent confirmed, by serial number, the tires that were subject to the Midwest Consent including 18 Goodyear 46/90R57/RM4A+2SL tires (collectively, the "Additional Midwest Tires").

211.   After OTR Tire Group and Midwest entered into their respective consents to take possession and foreclose, Midwest assisted Meridian in selling 18 of the Midwest Transaction #3 Tires, recouping $224,000 in proceeds for those tires.

212.   Prior to engaging with OTR Tire Group and Midwest with respect to their Consents, Meridian visited the Houston Facility to ensure that its tires were on site.

213.   On or about September 8, 2015, Meridian met with Adkins and Baltagi at the Houston Facility and they each reiterated to Meridian that all the tires were at the Houston Facility and were secure.

214.    Adkins went so far as to walk Meridian over to the area at the Houston Facility where the tires were stored and specifically pointed them out.

215.    As the OTR Tires were in stacks of multiple tires that were 10-15 feet in the high, it was not practicable to verify the tires' serial numbers.

216.    However, Adkins and XPO confirmed on that day that Meridian's tires were, in fact, at the Houston Facility and protected.

217.    Meridian did not know that before, and after, OTR Tire Group and Midwest executed their respective Consents, that Defendants and the business entities that they worked with and through had: i) either pledged the OTR Tire Group Tires and the Midwest Tires as collateral in numerous transactions with other investors; or ii) assigned the title to the OTR Tire Group Tires and the Midwest Tires to other entities.

218.    On January 22, 2018, Adkins filed for bankruptcy for Landash Corporation, one of the primary business entities through which he ran numerous fraudulent transactions. The bankruptcy case number in the Southern District of Ohio is 2:18-bk-50300 (the "Landash Bankruptcy").

219.    On February 9, 2020, Adkins filed for bankruptcy in the Southern District of Ohio (Case No. 2:18-bk-50671) (the "Adkins Bankruptcy").

220.    In the Adkins Bankruptcy, Adkins listed numerous business entities as his "DBAs", including Giant Tyres USA LLC, Midwest Coal LLC, and LAD ImpEx Corporation.

221.    Adkins did not provide notice to Meridian of the Landash Bankruptcy.

222.    Adkins did not provide notice to Meridian of the Adkins Bankruptcy.

223.    Meridian was not listed as a creditor in either the Adkins or the Landash Bankruptcy.

224.    The Adkins Bankruptcy and the Landash Bankruptcy were ultimately consolidated and a trustee, Amy Bostic, was assigned to handle the consolidated case.

225.    After Meridian was informed of the Adkins and Landash Bankruptcies, Meridian demanded access to the Houston Facility to inspect the OTR Tire Group Tires and the Midwest Tires.

226.    XPO refused to let Meridian enter the Houston Facility.

227.    In the course of the consolidated bankruptcy, Trustee Bostic marshaled all of the OTR tires at the Houston Facility.

228.    The Trustee verified that though there were 148 OTR tires at the Houston Facility, 42 of them had their serial numbers scratched out or otherwise damaged so that the serial numbers were not readable.

229.    Of these 132 tires in which Meridian had a purported ownership interest or, alternatively, a security interest, there were only 29 tires which were at the Houston Facility that could be confirmed to be the tires in which Meridian had invested.

COUNT I

Breach of Contract – OTR Tire Group

230.    Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

231.    The OTR Tire Group Finance Agreement is a valid and enforceable contract.

232.    Meridian fully performed its obligations under the OTR Tire Group Finance Agreement including wiring $1,636,800 for OTR Tire Group's purchase of the OTR Tire Group Tires.

233.    OTR Tire Group agreed to keep the OTR Tire Group Tires free of liens and encumbrances other than those imposed by Meridian.

234.    OTR Tire Group agreed to pay Meridian the amounts that OTR Tire Group borrower, together with accrued interest, attorney fees, legal costs, and additional charges pursuant to the terms and conditions of the OTR Tire Group Finance Agreement.

235.    OTR Tire Group breached the OTR Tire Group Finance Agreement by using the OTR Tire Group Tires as collateral in other transactions.

236.   OTR Tire Group breached the OTR Tire Group Finance Agreement by failing to pay Meridian the amounts due and owing.

237.   As a direct and proximate result of OTR Tire Group's breaches, after taking into account all credits, accrued interest, and applicable fees, Meridian has suffered damages in an amount to be proven at trial.

<u>COUNT II</u>

<u>Breach of Implied Covenant of Good Faith and Fair Dealing – OTR Tire Group</u>

238.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

239.   Every contract contains an implied covenant of good faith and fair dealing.

240.   The OTR Tire Group Finance Agreement is a valid and enforceable contract.

241.   OTR Tire Group had a duty not to impair Meridian's right to receive the benefits which should have flowed from the OTR Tire Group Finance Agreement.

242.   OTR Tire Group breached the implied covenant of good faith and fair dealing in the OTR Tire Group Finance Agreement through its explicit breaches of the OTR Tire Group Finance Group and by utilizing the OTR Tire Group Finance Agreement as a means of perpetuating a fraud on Meridian.

243.   OTR Tire Group's conduct has caused damages to Meridian in an amount to be proven at trial.

<u>COUNT III</u>

<u>Breach of Contract – Midwest</u>

244.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

245.   The Midwest Finance Agreement is a valid and enforceable contract.

246.   Meridian fully performed its obligations under the Midwest Finance Agreement including wiring $2,574,000 for Midwest's purchase of the Midwest Tires.

247.   Midwest agreed to keep the Midwest Tires free of liens and encumbrances other than those imposed by Meridian.

248.   Midwest agreed to pay Meridian the amounts that Midwest borrower, together with accrued interest, attorney fees, legal costs, and additional charges pursuant to the terms and conditions of the Midwest Finance Agreement.

249.   Midwest breached the Midwest Finance Agreement by using the Midwest Tires as collateral in other transactions.

250.   Midwest breached the Midwest Finance Agreement by failing to pay Meridian the amounts due and owing.

251.   As a direct and proximate result of Midwest's breaches, Meridian has suffered, after taking into account all credits, accrued interest, and applicable fees, damages in an amount to be proven at trial.

COUNT IV

Breach of Implied Covenant of Good Faith and Fair Dealing – Midwest

252.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

253.   Every contract contains an implied covenant of good faith and fair dealing.

254.   The Midwest Finance Agreement is a valid and enforceable contract.

255.   Midwest had a duty not to impair Meridian's right to receive the benefits which should have flowed from the Midwest Finance Agreement.

256.   Midwest breached the implied covenant of good faith and fair dealing in the Midwest Finance Agreement through its explicit breaches of the Midwest Finance Group and by utilizing the Midwest Finance Agreement as a means of perpetuating a fraud on Meridian and others.

257.   Midwest's conduct has caused damages to Meridian in an amount to be proven at trial.

COUNT V

Breach of Contract – Adkins and Dellinges

258.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

259.    The Adkins OTR Guaranty and the Adkins Midwest Guaranty constitute valid and enforceable contracts between Adkins and Meridian.

260.    The Dellinges Guaranty constitutes a valid and enforceable contract between Dellinges and Meridian.

261.    Pursuant to the guaranties, Meridian was obligated to perform certain duties and did, in fact, perform those duties.

262.    Pursuant to the guaranties, Adkins and Dellinges were obligated to perform certain duties.

263.    Adkins and Dellinges breached the guaranties to which each was a party, by failing to perform in accordance with their duties and obligations set forth in those guaranties.

264.    Adkins' and Dellinges' breaches have damaged Meridian in an amount to be proven at trial.

<u>COUNT VI</u>

<u>Breach of Contract – XPO</u>

265.    Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

266.    Meridian is a third-party beneficiary of the Warehouse Agreement between XPO and OTR Tire Group.

267.    Pursuant to the Warehouse Agreement, XPO agreed that it did not have any written notification that any person or entity other than Meridian held a security interest in OTR Tire Group's inventory.

268.    Upon information and belief, XPO breached the Warehouse Agreement because XPO had, in fact, received written notification that someone other than Meridian held a security interest in at least some of OTR Tire Group's inventory.

269.    Pursuant to the Warehouse Agreement, XPO agreed that Meridian could have access to the Houston Facility to examine and/or remove Meridian's inventory.

270.    XPO breached the Warehouse Agreement by refusing to give Meridian access to the Houston Facility to examine or remove Meridian's inventory.

271.    Pursuant to the Warehouse Agreement, XPO agreed that XPO would not issue warehouse receipts to any other party with respect to Meridian's inventory.

272.    XPO breached the Warehouse Agreement by issuing warehouse receipts to parties other than Meridian with respect to Meridian's inventory.

273.    Pursuant to the Warehouse Agreement, XPO agreed that XPO had not already issued warehouse receipts with respect to Meridian's inventory.

274.    Upon information and belief, XPO breached the Warehouse Agreement because XPO had already issued warehouse receipts to others with respect to Meridian's inventory.

275.    Pursuant to the Warehouse Agreement, XPO agreed that XPO would give Meridian an updated inventory upon Meridian's request for the same.

276.    XPO breached the Warehouse Agreement by refusing to provide Meridian with an updated inventory on Meridian's request.

277.    XPO entered into a direct verbal agreement with Meridian that not only contained the same duties set forth in the Warehouse Agreement but also required that XPO safeguard the collateral in which Meridian had an investment.

278.    Specifically, XPO promised Meridian to protect the tires and ensure that XPO would not take any action to impair Meridian's security or ownership in the tires or to allow the tires to leave the Houston Facility without Meridian's knowledge and consent.

279.    XPO breached its obligations to Meridian.

280.    As a direct and proximate result of XPO's breaches, Meridian has been damaged in an amount to be determined at trial.

<u>COUNT VII</u>

<u>Breach of Implied Covenant of Good Faith and Fair Dealing – XPO</u>

281.    Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

282.    Every contract contains an implied covenant of good faith and fair dealing.

283.   The Warehouse Agreement, and other agreements between XPO and Meridian, are valid and enforceable contracts.

284.   XPO had a duty not to impair Meridian's right to receive the benefits which should have flowed from the Warehouse Agreement or the other agreements between XPO and Meridian.

285.   XPO breached the implied covenant of good faith and fair dealing through its explicit breaches of the Warehouse Agreement and the other agreements with Meridian and by assisting the other Defendants in perpetuating a fraud on Meridian and others.

286.   Midwest's conduct has caused damages to Meridian in an amount to be proven at trial.

COUNT VIII

Breach of Contract – XPO

287.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

288.   Pursuant to the Midwest Warehouse Agreement, XPO agreed that it did not have any written notification that any person or entity other than Meridian held a security interest in OTR Tire Group's inventory.

289.   Upon information and belief, XPO breached the Midwest Warehouse Agreement because XPO had, in fact, received written notification that someone other than Meridian held a security interest in at least some of OTR Tire Group's inventory.

290.   Pursuant to the Midwest Warehouse Agreement, XPO agreed that Meridian could have access to the Houston Facility to examine and/or remove Meridian's inventory.

291.   XPO breached the Midwest Warehouse Agreement by refusing to give Meridian access to the Houston Facility to examine or remove Meridian's inventory.

292.   Pursuant to the Midwest Warehouse Agreement, XPO agreed that XPO would not issue warehouse receipts to any other party with respect to Meridian's inventory.

293.   XPO breached the Midwest Warehouse Agreement by issuing warehouse receipts to parties other than Meridian with respect to Meridian's inventory.

294.   Pursuant to the Midwest Warehouse Agreement, XPO agreed that XPO had not already issued warehouse receipts with respect to Meridian's inventory.

295.   Upon information and belief, XPO breached the Midwest Warehouse Agreement because XPO had already issued warehouse receipts to others with respect to Meridian's inventory.

296.   Pursuant to the Midwest Warehouse Agreement, XPO agreed that XPO would give Meridian an updated inventory upon Meridian's request for the same.

297.   XPO breached the Midwest Warehouse Agreement by refusing to provide Meridian with an updated inventory on Meridian's request.

298.   Pursuant to the Midwest Warehouse Agreement, XPO was required to safeguard the collateral in which Meridian had an investment.

299.   Specifically, XPO promised Meridian to protect the tires and ensure that XPO would not take any action to impair Meridian's security or ownership in the tires or to allow the tires to leave the Houston Facility without Meridian's knowledge and consent.

300.   XPO breached its obligations to Meridian.

301.   As a direct and proximate result of Midwest's breaches, Meridian has suffered damages in an amount to be proven at trial.

<u>COUNT IX</u>

<u>Fraud – Defendants</u>

302.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

303.   Dellinges, on Defendants' behalf, represented to Meridian that OTR Tire Group had recurring contracts with various buyers, including Production Tire and Giant.

304.   This representation was false.

305.   Dellinges, on Defendants' behalf, represented to Meridian that it had a potential sale of the OTR Tire Group Tires to Production Tire.

306.   This representation was false.

307.   Dellinges, on Defendants' behalf, provided to Meridian paperwork related to the sale to Production Tires.

308.   These documents were generated by Defendants to present a transaction that was, in fact, fictitious.

309.   Dellinges, Adkins, Baltagi and Neidik, on Defendants' behalf, represented to Meridian that LAD and Neidik were trustworthy and that they would safeguard the monies related to the purported transactions.

310.   This representation was false as Defendants knew that LAD and Neidik were co-conspirators in the fraudulent transactions in which Defendants were involved.

311.   Dellinges, Adkins, and Baltagi, on Defendants' behalf, represented to Meridian that the OTR Tire Group Tires were free and clear of any liens or encumbrances.

312.   This representation was false.

313.   Baltagi, on XPO's behalf, represented to Meridian that XPO would comply with the terms of the Warehouse Agreement, the Midwest Warehouse Agreement, and the other agreements between XPO and Meridian.

314.   These representations were false as Baltagi knew that the transactions with Meridian were part of a larger fraud, that Meridian's collateral was not secure, and that XPO and Defendants would not take any steps to safeguard Meridian's interests.

315.   Adkins, on Defendants' behalf, represented to Meridian that Midwest had recurring contracts with various buyers.

316.   This representation was false.

317.   Adkins, on Defendants' behalf, represented to Meridian that it had five potential sales of OTR tires.

318.   This representation was false.

319.   Adkins, on Defendants' behalf, provided to Meridian paperwork related to the five purported transactions with Midwest.

320.   These documents were generated by Defendants to present transactions that were, in fact, fictitious.

321.    Baltagi, on XPO's behalf, confirmed to Meridian that the tires that were the subject of the Midwest transactions had arrived at the Houston Facility.

322.    Subsequently, when Meridian inquired about whether the tires were still at the Houston Facility, Baltagi, on XPO's behalf, confirmed that they were.

323.    Either Baltagi misrepresented to Meridian that the tires did arrive in the first place or he misrepresented that they were still there upon Meridian's subsequent inquiry.

324.    Baltagi, on XPO's behalf, represented to Meridian that it did not have any written notification that any person or entity other than Meridian held a security interest in OTR Tire Group's inventory.

325.    This representation was false.

326.    Baltagi, on XPO's behalf, represented to Meridian that Meridian could have access to the Houston Facility to examine and/or remove Meridian's inventory

327.    This representation was false.

328.    Baltagi, on XPO's behalf, represented to Meridian that XPO would not issue warehouse receipts to any other party with respect to Meridian's inventory.

329.    This representation was false.

330.    Baltagi, on XPO's behalf, represented to Meridian that XPO had not already issued warehouse receipts with respect to Meridian's inventory.

331.    This representation was false.

332.    Baltagi, on XPO's behalf, represented to Meridian that it would give Meridian an updated inventory upon Meridian's request for the same.

333.    This representation was false.

334.    Baltagi knew, when he made the numerous representations referenced in this complaint, that the collateral in which Meridian was investing was part of a broader fraudulent scheme and that XPO would not, in fact, comply with any of the representations which had been made to induce Meridian to enter into the transactions.

335.    Dellinges, Adkins, and Baltagi, on Defendants' behalf, represented to Meridian that the OTR Tire Group Tires were free and clear of any liens or encumbrances.

336.   This representation was false.

337.   Baltagi, on XPO's behalf, represented to Meridian that XPO would comply with the terms of the Warehouse Agreement, the Midwest Warehouse Agreement, and the other agreements between XPO and Meridian.

338.   These representations were false as Baltagi knew that the transactions with Meridian were part of a larger fraud, that Meridian's collateral was not secure, and that XPO and Defendants would not take any steps to safeguard Meridian's interests.

339.   Defendants' misrepresentations were material to the transaction and Meridian would not have entered into the OTR Tire Group Finance Agreement, the Midwest Finance Agreement, the Warehouse Agreement, the Midwest Warehouse Agreement, or any other agreement related to the Defendants but for the numerous misrepresentations made by Defendants.

340.   Defendants knew their misrepresentations were false and had knowledge of their falsity.

341.   Defendants intended that Meridian rely on their false statements.

342.   Defendants created their fraudulent scheme to induce Meridian to wire the funds that it actually did wire to LAD.

343.   Meridian was justified in relying on Defendants' misrepresentations as they were confirmed by the other Defendants.

344.   Meridian also conducted due diligence based on Meridian's own physical inspection of the OTR Tire Group Tires and the Midwest Tires and on documents provided by Defendants without any knowledge that the documents contained false information.

345.   Meridian suffered harm as a result of Defendants' fraud: it wired $4,210,800 to LAD for the purchase of the OTR Tire Group Tires and the Midwest Tires.

COUNT X

Conversion – All Defendants

346.    Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

347.    Pursuant to the Consents referenced in this complaint, Meridian owns the OTR Tire Group Tires and the Midwest Tires.

348.    The OTR Tire Group Tires and the Midwest Tires were under the physical control of XPO and Roadmaster Trucking, who were acting on behalf of all the Defendants.

349.    Meridian was entitled to the possession of the Tires.

350.    As many as 103 of the 132 OTR tires in which Meridian invested and which Meridian owned, were removed from the Houston Facility.

351.    There is an additional quantity of OTR tires at the Houston Facility whose serial numbers were destroyed, thus rendering it impossible to determine the identity of such tires.

352.    The OTR tires could not have been removed from the Houston Facility without XPO and Roadmaster Trucking's explicit knowledge and consent.

353.    The OTR tires' serial numbers could not have been removed or defaced without XPO and Roadmaster Trucking's explicit knowledge and consent.

354.    XPO, whether on its own behalf, or on behalf of the Defendants, has assumed and exercised dominion and control over the OTR Tire Group Tires and the Midwest Tires which were removed from the Houston Facility, and did so in an unlawful and unauthorized manner, to the exclusion of, and in a manner inconsistent with, Meridian's rights.

355.    Meridian has since made a demand for the OTR Tire Group Tires and the Midwest Tires which were removed from the Houston Facility and XPO has refused, and continues to refuse, to turn over these aforementioned tires.

356.    XPO's conversion of these tires has damaged Meridian in the amounts prayed for below.

357.   Alternatively, Roadmaster Trucking, whether on its own behalf, or on behalf of XPO or the Defendants, has assumed and exercised dominion and control over the OTR Tire Group Tires and the Midwest Tires which were removed from the Houston Facility, and did so in an unlawful and unauthorized manner, to the exclusion of, and in a manner inconsistent with, Meridian's rights.

358.   Meridian has since made a demand for the OTR Tire Group Tires and the Midwest Tires which were removed from the Houston Facility and Roadmaster Trucking has refused, and continues to refuse, to turn over these aforementioned tires.

359.   Roadmaster Trucking's conversion of these tires has damaged Meridian in the amounts prayed for below.

COUNT XI

Negligent Bailment – XPO

360.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

361.   Meridian requested services from XPO in relation to storage of the OTR Tire Group Tires and the Midwest Tires. XPO thereafter stored the OTR Tires and has since had possession of the OTR Tires pursuant to the Warehouse Agreement, the Midwest Warehouse Agreement, and the other agreements between XPO and Meridian.

362.   XPO was therefore a bailee of the OTR tires and Meridian was the bailor.

363.   This bailment was for the mutual benefit of the bailor and the bailee and was based on a valid contract and consideration.

364.   XPO was under the duty to discharge in a reasonable manner all of the duties and obligations imposed on a bailee who is in possession of property, and that duty was breached by the manner and method in which XPO held, possessed, removed, and disposed of the OTR Tires belonging to Meridian as described above.

365.   XPO was guilty of the following acts of negligence which, separately and concurrently, proximately caused injuries and damages to Meridian: a) failing to take any of the necessary and reasonable measures to preserve the OTR tires and to prevent

fraudulent conveyance and/or disposal of the OTR tires; b) failing to notify and advise Meridian that the OTR tires were being removed from XPO's possession in an unauthorized manner; c) removing the OTR tires from the Houston Facility in an unauthorized manner; d) failing to stay adequately apprised of the condition, whereabouts, and authorizations relating to the OTR tires while XPO had possession of the OTR tires; and d) disposing of the OTR tires without Meridian's authorization, approval, permission, or consent.

COUNT XII

Civil Conspiracy – All Defendants

366.    Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

367.    Defendants, by common understanding and design, came to a mutual understanding to create false documents and communications purportedly evidencing various OTR tire transactions to induce Meridian to enter into the OTR Tire Group Finance Agreement and the Midwest Finance Agreement and to wire $4,210,800 to LAD.

368.    Two or more persons were involved as all of Defendants participated in the conspiracy.

369.    Defendants acted with malice as they intentionally created fraudulent documents and communications for the express purpose of defrauding Meridian

370.    As part of and in furtherance of the conspiracy, Defendants created fraudulent documents and communications that were transmitted to Meridian for the express purpose of defrauding Meridian.

371.    As a direct and proximate result of Defendants' conspiracy, Meridian has suffered damages in excess of $21,407,584.

COUNT XIV

RICO Violations (18 U.S.C. § 1962(c)) – All Defendants

372.    Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

373.   Defendants formed a non-legal, "association-in-fact" enterprise with an orchestrated organizational structure that divided responsibilities between them.

374.   OTR Tire Group and Midwest, through Dellinges, Adkins, and Eckerd were responsible for soliciting Meridian, other purchasers, and lenders to buy tires or provide financing in fraudulent tire transactions.

375.   OTR Tire Group and Midwest also maintained an inventory of OTR tires at the Houston Facility that could be repeatedly used as bait to entice buyers or lenders in fabricated sales to third party buyers.

376.   Best One and Henderson acted as the "supplier" of the OTR Tires by producing and distributing fabricated work orders, invoices, and bills of sale.

377.   XPO, through Baltagi, acted as the storage facility. XPO would confirm that OTR Tires were on site at the Houston Facility causing purchasers to release funds or lenders to disburse financing.

378.   XPO, through Baltagi, acted like an escrow agent for the tires: it "received" tires and acted as an independent third party so that the purchaser or lender would feel comfortable disbursing funds or loan proceeds.

379.   LAD, through Neidik, acted as the freight forwarder and escrow agent.

380.   LAD was responsible for "shipping" the OTR tires to buyers. LAD was also responsible for receiving funds from purchasers or lenders to hold in escrow until the purchaser or lender authorized LAD to release the funds. In furtherance of the fraud, upon information and belief, LAD wired money to Adkins' entities such as Midwest instead of the actual seller of the OTR Tires.

381.   Defendants' association-in-fact enterprise has been operating as a continuing enterprise as Midwest and OTR Tire Group, through Dellinges, Adkins, and XPO have kept inventory at the Houston Facility continually since at least 2013 and Midwest, OTR Tire Group, and other entities created and controlled by Defendants have continued to create false purchase transactions since at least 2013.

382.    All the Defendants participated in the operation or management of the association-in-fact enterprise by assisting in the fraudulent scheme

383.    The Defendants' actions constitute numerous violations of the RICO predicate offenses listed in 18 U.S.C. § 1961(1).

384.    As fully described above, Defendants engaged in numerous counts of wire fraud in violation of 18 U.S.C. § 1343, numerous counts of money laundering in violation of 18 U.S.C. § 1956, and numerous counts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

385.    Defendants' actions also sufficiently meet the open-ended continuity requirement as there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed.

386.    Hundreds of OTR tires, including at least 103 tires owned by Meridian, disappeared from the Houston Facility without a trace.

387.    Upon information and belief, Defendants continue to maintain inventory of OTR tires somewhere other than the Houston Facility.

388.    The association-in-fact enterprise does not have an ending point. Additionally, there is no perceivable limit to the number of companies or individuals that Defendants could seek to defraud as evidenced by the numerous lawsuits alleging Defendants participated in similar fraudulent transactions.

389.    Alternatively, there is a closed-ended continuity that ended with the Adkins Bankruptcy, but the racketeering extended for years, starting in, at the latest, 2013 and ending in 2018.

390.    Meridian's injuries and losses were caused by Defendants' racketeering activities.

391.    The Defendants acts of wire fraud in violation of 18 U.S.C. § 1343 caused the transmission of falsified records via email to Meridian that were specifically designed to induce Meridian to distribute $4,210,800 for the fraudulent purchase of OTR tires.

392.     Because Defendants provided these false records via electronic transmission in violation of 18 U.S.C. § 1343, Meridian was fraudulently induced to wire transfer $4,757,800 to LAD, thereby suffering injury.

393.     Meridian also suffered harm as a result of Defendants' money laundering, engaging in monetary transactions in property derived from specified unlawful activity, transportation of stolen money, and receipt of stolen money in violation of 18 U.S.C. §§ 1956, 1957, 2314, and 2315.

394.     Meridian has suffered harm to its business and property. Because of Defendants' racketeering activities, Meridian was fraudulently induced to disburse $4,210,800, which is lost as a result of Defendants' conduct, and, to date, has been deprived of at least 103, and potentially 132, OTR Tires it purportedly invested in and, ultimately, gained ownership of.

<u>COUNT XVI</u>

<u>Negligence – Roadmaster</u>

395.     Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

396.     Roadmaster owns the Houston Facility.

397.     Roadmaster and XPO acted on each other's behalf with respect to the operations at the Houston Facility.

398.     Roadmaster was aware of the inventory of OTR tires held by Meridian at the Houston Facility, knew which tires were Meridian's, and was aware of XPO's contractual obligations to Meridian.

399.     Roadmaster had a duty of care to Meridian in relation to the warehousing, handling, and shipping of Meridian's OTR tires and had a duty to discharge its obligations in a way that was commercially reasonable.

400.     Roadmaster had exclusive control over loading, unloading, removing, moving, or otherwise physically handling the OTR tires at the Houston Facility, including the OTR Tire Group Tires and the Midwest Tires.

401.   Upon information and belief, Roadmaster Trucking negligently handled the OTR tires in such a way as the serial numbers on such tires were removed, damaged, or defaced in such a way as to render them unidentifiable.

402.   Alternatively, Roadmaster Trucking took active steps to remove, damage, or deface the serial numbers on the OTR tires at the behest of others, but was negligent in doing so without ensuring that doing so was not in violation of another's rights.

403.   Roadmaster Trucking negligently allowed the OTR tires to be removed from the Houston Facility by a third party.

404.   Alternatively, Roadmaster Trucking negligently removed the OTR tires from the Houston Facility.

405.   Roadmaster Trucking's acts of negligence deprived Meridian of its rights in the OTR tires or Meridian's ability to assert its rights in the OTR tires.

406.   Roadmaster Trucking's negligence or, alternatively, intentional acts, caused damage to Meridian in the amounts prayed for below.

<u>COUNT XVII</u>

<u>Alter Ego - Defendants</u>

407.   Meridian hereby incorporates by reference each preceding paragraph set forth in this complaint as if fully rewritten herein.

408.   OTR Tire Group, Midwest, and LAD are alter egos of the other Defendants.

409.   Upon information and belief, the Defendants used the corporate forms as part of a fraud.

410.   Upon information and belief, the business of these entity defendants was not conducted on a corporate basis.

411.   Upon information and belief, the enterprises acting under the name of these entity defendants were not established on an adequate financial basis.

412.   Upon information and belief, and at all times relevant hereto, there existed such a unity of interest and ownership that the separate personalities of these entity defendants and their owners ceased to exist.

413.    Meridian is entitled to a declaration from this court that the entity defendants may be disregarded, holding the principals of those entities, the entities themselves, and the Defendants who utilized and worked with those entities to perpetuate the fraudulent scheme set forth in this complaint, jointly and severally liable for the damages alleged herein.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Meridian PO Finance, LLC, demands judgment against Defendants as follows:

a. Compensatory damages in excess of $75,000.00;

b. Incidental damages;

c. Attorneys' fees pursuant to 18 U.S.C. § 1964(c);

d. Pre-judgment and post-judgment interest at the statutory rate;

e. Punitive damages;

f. Treble damages pursuant to 18 U.S.C. § 1964(c);

g. Costs; and

h. Any further relief that this Court deems just and equitable.

**DATED** July 6, 2021.          **ANDERSON CLARKSON JOHNSON BROWN, PLLC**

By: _____

Nat Clarkson

Attorneys for Plaintiff

1

**CERTIFICATE OF SERVICE**

2

I, Nat Clarkson, hereby certify that, on July 6, 2021, I transmitted the foregoing (as

3

noted) to the following:

4

Chris Dellinges          (Emailed)
1230 Clipston Drive

5

Prosper, TX 75078

6

Afif Baltagi             (Emailed)

7

2308 Nantucket Drive
Apartment C

8

Houston, TX 77057

9

OTR Tire Group, Inc.     (Emailed)

10

4901 LBJ Freeway
Suite 200

11

Dallas, TX 75244

12

Andrew F. Halaby         (Electronically

13

Rachael Peters Pugel     and emailed)
Snell & Wilmer L.L.P.

14

One Arizona Center

15

400 E. Van Buren
Suite 1900

16

Phoenix, Arizona 85004

17

Counsel for XPO

18

19

By: _____

20

Nat Clarkson

21

22

23

24

25

26

27

28